Pitney Hardin LLP

(MAIL TO) P.O. BOX 1945 MORRISTOWN, N.J. 07962-1945
(DELIVERY TO) 200 CAMPUS DRIVE, FLORHAM PARK, N.J. 07932-0950
(973) 966-6300

Attorneys for Plaintiff
Ramada Worldwide Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAMADA WORLDWIDE INC., formerly known as Ramada Franchise Systems, Inc., a Delaware Corporation, | : HONORABLE<br>: Civil Action No. 06-<br>: |
| Plaintiff, | : |
| v. | : **COMPLAINT** |
| ASHEBORO TECTEL II, LLC, a North Carolina Corporation, | : |
| Defendant. | : |

        Plaintiff Ramada Worldwide Inc., formerly known as Ramada Franchise Systems, Inc., by its attorneys, Pitney Hardin LLP, complaining of defendant Asheboro Tectel II, LLC, says:

Ramada Worldwide Inc., Site 14440

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Ramada Worldwide Inc. ("RWI"), formerly known as Ramada Franchise Systems, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.     Defendant Asheboro Tectel II, LLC ("Tectel"), on information and belief, is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business at Tiffany Office Plaza, 800 Tiffany Boulevard, Rocky Mount, North Carolina.

3.     On information and belief, Tectel was administratively dissolved on or about April 5, 2005 for failing to file an annual report with the North Carolina Department of the Secretary of State.

4.     On information and belief, the constituent members of Tectel are H. William Hull, Jr. ("Hull"), a citizen of the State of North Carolina, and Asheboro Comfort Florida Partnership, a general partnership organized and existing under the laws of the State of Florida, with its principal place of business in Florida.

5.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

- 2 -

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Tectel by virtue of, among other things, section 17.6.3 of the May 23, 2002 License Agreement by and between Tectel and RWI (the "License Agreement"), described in more detail below, pursuant to which Tectel has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8. Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Tectel of any objection to venue in this District.

### ALLEGATIONS COMMON TO ALL COUNTS

#### The Ramada Marks

9. RWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services.

10. RWI has the exclusive right to sublicense the use of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Ramada Marks"), as well as the distinctive Ramada® System, which provides hotel services to the public under the Ramada name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

11. RWI or its predecessors have continuously used each of the Ramada Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

12. RWI has given notice to the public of the registration of the Ramada Marks as provided in 15 U.S.C. § 1111.

13. RWI uses or has used the words "Ramada," "Ramada Plaza Hotel," "Ramada Inn," and "Ramada Limited," among others, as abbreviations of its brand name.

14. Through its franchise system, RWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States. In order to identify the origin

of their guest lodging services, RWI allows its franchisees to utilize the Ramada Marks and to promote the Ramada brand name.

15.   RWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Ramada Marks as distinctly designating RWI guest lodging services as originating with RWI.

16.   The value of the goodwill developed in the Ramada Marks does not admit of precise monetary calculation, but because RWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of RWI' goodwill exceeds hundreds of millions of dollars.

17.   The Ramada Marks are indisputably among the most famous in the United States.

### The Agreements Between The Parties

18.   On or about May 23, 2002, RWI entered into the License Agreement with Tectel for the operation of a 90-room guest lodging facility located at 825 West Dixie Drive, Asheboro, North Carolina, Site No. 14440 (the "Facility").   A

true copy of the License Agreement is attached hereto as Exhibit A.

19.   On or about May 23, 2002, RWI and Tectel also entered into an Addendum to the License Agreement for Satellite Connectivity Services (the "Addendum").   A true copy of the Addendum is attached hereto as Exhibit B.

20.   Pursuant to section 5 of the License Agreement, Tectel was obligated to operate a Ramada guest lodging facility for a 15-year term, during which time Tectel was permitted to use the Ramada Marks in association with the operation and use of the Facility as part of RWI's franchise system.

21.   Pursuant to section 3 of the License Agreement, Tectel was required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the License Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by RWI.

22.   Pursuant to section 3.4 of the License Agreement, Tectel was required to operate the Facility in compliance with RWI's "System Standards," as defined in the License Agreement, including RWI's quality assurance requirements.

27. Pursuant to section 11.2 of the License Agreement, RWI could terminate the License Agreement, with notice to Tectel, for various reasons, including Tectel's (a) failure to pay any amount due RWI under the License Agreement, (b) failure to remedy any other default of its obligations or warranties under the License Agreement within 30 days after receipt of written notice from RWI specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

28. Pursuant to section 12.1 of the License Agreement and section 13(c) of the Addendum, Tectel agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to RWI in accordance with a formula specified in the License Agreement and Addendum.

29. Section 18.2 of the License Agreement specifically set liquidated damages for the Facility at $100,000 for any termination of the License Agreement that occurs before the last two License Years (as defined in the License Agreement), and section 13(c) of the Addendum specifically set liquidated damages at $1,000.

30.  Section 13 of the License Agreement specified Tectel's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Ramada Marks.

31.  Pursuant to section 17.4 of the License Agreement, Tectel agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

### The Defendant's Defaults and Termination

32.  Beginning in 2004, Tectel repeatedly failed to operate the Facility in accordance with RWI's System Standards, in breach of its obligations under the License Agreement.

33.  By letter dated February 26, 2004, a true copy of which is attached hereto as Exhibit C, RWI advised Tectel that (a) it was in breach of the License Agreement for failing to pay RWI Recurring Fees, (b) it had 30 days within which to cure this monetary default in accordance with Section 11.1 of the License Agreement, and (c) if the default was not cured, then certain special stipulations in the License Agreement would

automatically terminate and the License Agreement might be subject to termination.

34. On March 30, 2004, RWI conducted a quality assurance ("QA") inspection of the Facility. By letter dated May 25, 2004, a true copy of which is attached hereto as Exhibit D, RWI advised Tectel that the Facility received a failing score in the QA inspection and, as a result, Tectel was in default of its obligations under the License Agreement.

35. Also by letter dated March 30, 2004 (Ex. D), RWI advised Tectel that (a) it remained in breach of the License Agreement for failing to pay RWI Recurring Fees, (b) it had until August 23, 2004 to cure both the monetary default and the quality assurance default, (c) certain special stipulations in the License Agreement had automatically terminated, and (d) if the defaults were not cured, then the License Agreement would terminate effective September 9, 2004.

36. On September 9, 2004, RWI conducted another QA inspection of the Facility in which the Facility received a failing score.

37. By letter dated December 7, 2004, a true copy of which is attached hereto as Exhibit E, RWI terminated the License Agreement and advised Tectel that (a) it was to

immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as part of the Ramada System, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Ramada, (b) all items bearing the Ramada Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Ramada had to be changed, (d) it was required to pay to RWI as liquidated damages for premature termination the sum of $101,000 as required under the License Agreement and Addendum, (e) it had to de-identify the Facility within 14 days from the receipt of the notice, and (f) demand was made for all outstanding Recurring Fees through the date of termination.

38.   The termination of the License Agreement precluded Tectel from any further use of the Ramada Marks in or around the Facility.

39.   The termination of the License Agreement precluded Tectel from any further use of the Ramada Marks to induce the traveling public to use the Facility in any way.

40.   After the termination of the License Agreement, Tectel continued to use the Ramada Marks to induce the traveling public to rent guest rooms at the Facility.

- 11 -

41.  After the termination of the License Agreement, Tectel used the Ramada Marks without authorization to rent rooms by, among other things, failing to remove Ramada signage.

42.  Tectel continued to misuse the Ramada Marks despite receiving notification from RWI to cease and desist from the misuse of the Ramada Marks.

## FIRST COUNT

43.  RWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 42 of the Complaint.

44.  Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant – use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

45.  Tectel marketed, promoted, and rented rooms at the Facility through the unauthorized use of the Ramada Marks,

- 12 -

and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

46.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action . . . ."

47.   The acts of Tectel in marketing, promoting, and renting rooms at the Facility, through and with the Ramada Marks, constituted:

(a)   a false designation of origin;

(b)   a false and misleading description of fact; and

(c)   a false and misleading representation of fact;

that caused confusion, or caused mistake, or deception, as to the affiliation of Tectel's Facility with RWI, and caused confusion, or caused mistake, or deception, to the effect that RWI sponsored or approved of the guest lodging services that Tectel provided at the Facility, all in violation of Section 43(a) of the Lanham Act.

48.    Tectel's prior acts of infringement in violation of Sections 32 and 43(a) of the Lanham Act were malicious, fraudulent, willful, and deliberate.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114 and 1125(a), RWI demands judgment against Tectel granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

### SECOND COUNT

49.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 48 of the Complaint.

50.    Pursuant to sections 3.8.2 and 4.8 of the License Agreement, Tectel agreed to allow RWI to examine, audit, and make copies of Tectel's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

- 14 -

51. Tectel has engaged in acts and practices, as described, which amount to infringement of the Ramada Marks in an unlawful, unfair, and fraudulent manner which was likely to confuse the public.

52. As a result, Tectel owes restitution and the disgorgement of profits, in an amount unknown to RWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Tectel.

**WHEREFORE**, RWI demands judgment ordering that Tectel account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada Marks.

### THIRD COUNT

53. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 52 of the Complaint.

54. On December 7, 2004, RWI terminated the License Agreement and Addendum.

55. Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due

to action of the Licensee, Tectel shall pay liquidated damages to RWI within 30 days of termination.

56.   Section 13( c) of the Addendum provides that, in the event of any termination of the Addendum, Tectel shall pay liquidated damages to RWI within 10 days.

57.   As a result of the termination of the License Agreement and Addendum, Tectel is obligated to pay RWI liquidated damages in the amount of $101,000, as calculated pursuant to sections 12.1 and 18.2 of the License Agreement and section 13(c) of the Addendum.

58.   Notwithstanding RWI's demand for payment, Tectel has failed to pay RWI the liquidated damages as required in section 12.1 of the License Agreement and section 13(c) of the Addendum.

59.   RWI has been damaged by Tectel's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against Tectel for liquidated damages in the amount of $101,000, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

60.   RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 59 of the Complaint.

61.   By virtue of the premature termination of the License Agreement, RWI sustained a loss of future revenue over the remainder of the 15 year term of the License Agreement.

62.   If the Court determines that Tectel is not liable to pay RWI liquidated damages as required by section 12.1 of the License Agreement, in the alternative, Tectel is liable to RWI for actual damages for the premature termination of the License Agreement.

63.   RWI has been damaged by Tectel's breach of its obligation to operate a Ramada guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, RWI demands judgment against Tectel for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

64.   RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 63 of the Complaint.

65.   Pursuant to sections 7 and 18.1 and Schedule C of the License Agreement, Tectel was obligated to remit Recurring Fees to RWI.

66.   Despite its obligation to do so, Tectel failed to remit certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $114,050.07.

67.   Tectel's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged RWI.

**WHEREFORE,** RWI demands judgment against Tectel for the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

68.   RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 67 of the Complaint.

69. At the time of the termination of the License Agreement, Tectel was obligated to pay RWI Recurring Fees.

70. Despite its obligation to do so, Tectel failed to pay certain of the Recurring Fees due and owing under the License Agreement.

71. In addition, Tectel benefited from its wrongful use of the Ramada Marks after termination of the License Agreement and paid no royalty or other Recurring Fees to RWI in return for that benefit.

72. Tectel's failure to compensate RWI constitutes unjust enrichment and has damaged RWI.

**WHEREFORE,** RWI demands judgment against Tectel for the Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit and all royalties and other Recurring Fees that should be paid to compensate RWI for the period during which Tectel misused the Ramada Marks and was thereby unjustly enriched, together with interest and costs of suit.

**PITNEY HARDIN** LLP
Attorneys for Plaintiff
Ramada Worldwide Inc.

By: _____
        DAVID S. SAGER
        A Member of the Firm

Dated:   January 12, 2006

- 19 -

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**PITNEY HARDIN** LLP
Attorneys for Plaintiff
Ramada Worldwide Inc.

By: _____
DAVID S. SAGER
A Member of the Firm

Dated:      January 12, 2006

- 20 -

# EXHIBIT A

Location: **Asheboro, NC**
Entity No.
Unit No.:   *14440*

# RAMADA FRANCHISE SYSTEMS, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated _5 - 23_ , 200_2_, is between RAMADA FRANCHISE SYSTEMS, INC., a Delaware corporation ("we", "our" or "us"), and **Asheboro Tectel II LLC, a ~~Florida~~ Limited Liability Company** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We acquired from Franchise Systems Holdings, Inc. ("FSH") pursuant to the Master License Agreements the right to use and to sublicense certain trade names, trademarks and service marks including the Marks and the distinctive Ramada System for providing transient guest lodging services to the public under the "RAMADA" name and certain services to its licensees, including the Reservation System, advertising, marketing and training services. We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Ramada Limited."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, brand, cooperative or registered mark during the Term.

## 2. Ramada Inns National Association.

2.1   **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2   **Annual Conference.** A RINA conference is held each year. The conference date and location will be determined by the RINA Executive Committee after consultation with us. You will pay not less than one "Conference Registration Fee" for each Facility you own. When you pay the Conference Registration Fee, you may send your representative to the conference. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

1

RAMEXC1 11 01
109490

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score at least 400 (or equivalent) points under our quality assurance inspection system and be ready to open for business under the System, is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of at least 400 (or equivalent) points before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date as the Punch List requires so that the Facility scores at least 425 points (or equivalent) on a quality assurance inspection within nine (9) months after the Opening Date. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

2

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You will participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and

3

benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.2  The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs.   You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8  **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.   You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  We may notify you of a date on which we propose to audit the Facility's books and records.  You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards.  If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced.  We may also perform an audit of the Facility's books and records without advance notice.  Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during

4

normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which will not exceed $500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may publish and disclose the results of quality assurance inspections.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Ramada Franchise Systems, Inc., Cendant Finance Holding Corporation and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a RINA conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points or equivalent and the most recent quality assurance inspection score for the Facility was at least 400 points or equivalent when the Facility is otherwise eligible for a Minor Renovation.

**4.  Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1  **Training.**  We will offer general manager orientation training, owners orientation training, property opening training, recurrent training and supplemental training.

4.1.1  **General Manager Orientation Training.**  Between 60 days before and 90 days after the projected Opening Date, we will offer at a location in the United States we designate and a Facility manager (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Any replacement manager of the Facility must complete the training program within the time specified in the System Standards

6

Manual. We charge you tuition of $975 for your first general manager if you open the Facility with our approval and your general manager completes manager orientation within the time periods established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines. For any supplemental or replacement manager, you pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2 **Owners Orientation Training.** If this is your first System license, we will offer and you (or a person with executive authority if you are an entity) must attend owners orientation training, preferably before, but no later than 90 days after the projected Opening Date. We will conduct the owners orientation program to familiarize you with the System, the Chain, and our services. The program will be no longer than three days. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000. You must also pay for your travel, lodging, meals and other incidental expenses.

4.1.3 **Property Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, a property opening training program (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial property opening training program. We may require refresher training if the Facility does not meet Operations Standards. You will pay the cost of any site used if the Facility is not available. You must provide lodging for the trainers at your expense. You must also pay the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for the initial property opening training.

4.1.4 **Recurrent Training.** We will provide training for you and the Facility's manager if we determine that additional training for licensees and managers is necessary from time to time. Training will be held at our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this program. This training may be held in conjunction with a Chain or regional conference or workshop. If recurrent training is held at your Facility, you must also pay for the trainer's reasonable travel, lodging, meal and out-of-pocket expenses. We may assess you a reasonable charge for course materials.

4.1.5 **Supplemental Training.** We may offer optional training programs without charge or for reasonable tuition. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices.

4.1.6 **Cancellation Fees and Tuition.** We may charge you a reasonable cancellation fee if you cancel your training program commitments or reservations within 30 days (or such shorter period as we may specify) before the start of any training program at which you or your representative has a reservation.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA

7

Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance. improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

### 4.3 Marketing.

4.3.1 We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

8

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.9. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00. effective any time after December 31. 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires on the day prior to the fifteenth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of License Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of **$17,500.00**, when you sign this Agreement, which is fully earned when we sign this Agreement.

9

## 7. Recurring Fees, Taxes and Interest.

7.1  You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1  A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any

10

breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

11

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility of similar age and condition converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions

12

within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary

13

bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3 Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To

RAMEXCI 11/01
109490

the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1 Generally. If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.2, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be **as set forth in Section 18.2.** If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable under the preceding sentence. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

## 13. Your Duties At and After Termination. When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

15

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

14. **Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws,

16

agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own. in whole or in part, and manage, operate, use, lease, finance. sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location. There are no territorial rights or agreements between the parties. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing. approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

17

15.4  **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5  **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6  **The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2

## 16. Relationship of Parties.

16.1  **Independence.**  You are an independent contractor.  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever.  We and you have a business relationship based entirely on and circumscribed by this Agreement.  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including,

18

but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status.**   If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly.   The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

16.3   **FSH Rights.**   In the event our rights to (i) any of the Marks or the Ramada System shall be terminated pursuant to the Master License Agreements (other than as a result of a purchase option we exercise as set forth therein), or (ii) we liquidate, dissolve or otherwise cease to do business, then FSH or its assignee shall have the right to succeed to all of our rights in, to and under this Agreement and any other agreements between you and us entered into pursuant to this Agreement, and in such event FSH or its assignee shall be obligated to perform our duties and assume all of our obligations under any such agreements.

## 17. Legal Matters.

17.1   **Partial Invalidity.**   If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.   If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.   Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.   All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.**   Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. The parties may also communicate via electronic mail between addresses to be established by notice.   You consent to receive electronic mail from us.   Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Franchise Systems, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

RAMEXC1 11/01
109490

Your name: **Asheboro Tectel II LLC,**
Your address: **Tiffany Office Plaza, 800 Tiffany Blvd., Suite 301, ~~Lucky~~ Mount, NC 27804,**
Attention: **Bill Hull;**
Your fax No.:. *252 977 3389*

**17.4 Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5 Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6 Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the licensor, the licensee, any guarantor, and their respective successors and assigns.**

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this**

20

Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

18.  **Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Special Royalty.** Notwithstanding Section 7.1 the Royalty rate on Gross Room Revenues accruing during the following periods will be as follows; **provided that the Facility opens in accordance with the deadline established by the terms of this Agreement**

18.1.1 The Royalty shall be two percent (2.0%) of Gross Room Revenues for the first License Year; and

18.1.2 The Royalty shall be three percent (3.0%) of Gross Room Revenues for the second License Year; and

18.1.3 The Royalty shall be at the rate specified in Section 7.1 after the second License Year.

18.1.4 The Royalty rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty shall reset to the rate specified in Section 7.1, if and as of the date (i) a Termination occurs, (ii) we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default or, (iii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 425 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 425 in a reinspection to be performed not less than 30 days after the initial inspection.

21

18.2 **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Hundred Thousand Dollars ($100,000.00).

18.3 **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth and tenth anniversaries of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 425 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 425 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.4 **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth and tenth anniversaries of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.5 **Limitation on Debt.** You covenant that you shall not, during the Term, directly or indirectly create, incur, assume, guarantee, or cause the Facility to become subject to, "Debt" that is "Secured" by your interest in the Facility, having a "Value" in excess of seventy five percent (75%) of the "Fair Market Value" of the Facility. "Debt" means notes, bonds, debentures, capital or financing leases, and other similar evidence of indebtedness. "Secured" means that your interest in the Facility is subject to any recorded or unrecorded lien (except liens for property taxes not yet overdue), security interest, financial covenant or encumbrance, mortgage, deed of trust, deed to secure debt, leasehold mortgage, contract for deed, or unsatisfied judgment more than 20 days after entry in the real property title records of the jurisdiction where the Facility is located. "Value" means the principal amount of all Debt, plus interest, penalties and late charges arising from any late payment of principal or interest, plus the present value of capital lease payments. "Fair Market Value" means the fair market value of the Facility (unforced, arms'-length sale price between willing buyer and seller), as determined by an independent appraisal not more than 3 years old at the time of computation, and subject to adjustment for circumstances adversely and materially affecting the value of the Facility. If no such appraisal is available, the book value determined under generally accepted accounting principles shall be used. You will furnish to us a certificate executed by your chief executive or chief financial officer within 60 days after each of your fiscal

22

years that certifies compliance with this covenant. You shall notify us within 10 days after new Debt is incurred, describing the amount, lender and nature of the Debt. You will cure a violation of this covenant within thirty (30) days after a breach occurs by reducing the Debt so that the ratio of Debt to Fair Market Value does not exceed the percentage established above, or by causing a majority of your Equity Interest owners to sign and deliver to us our standard form of personal guaranty then accepted in transactions for additional Chain Facilities. Notice of this covenant may be placed in the public record of title to your interest in the Facility by the Declaration of License Agreement or otherwise.

RAMEXC1 11/01
109490

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
RAMADA FRANCHISE SYSTEMS, INC.:

By: _____
            Vice President

Attest: _____
                Assistant Secretary

**YOU,** as licensee:
**Asheboro Tectel II LLC**

By: _____
            Manager

Witness: _____

23

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.  Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of License Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

24

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and

25

entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one-year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 825 West Dixie Drive, Asheboro, NC 27204 as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

26

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

27

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

28

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Franchise Systems, Inc., a Delaware corporation, its successors and assigns.

29

## SCHEDULE A

**(Legal Description of Facility)**

RAMEXC1 11/01
109490

**SCHEDULE B**

PART I:     YOUR OWNERS:

Name                Ownership Percentage          Type of Equity Interest

**William Hull, Jr.**        **50%**                            **member**
**Asheboro Comfort**       **50%**                            **member**
**Florida Partnership**

PART II:            THE FACILITY:

Primary designation of Facility: **Ramada Limited**

Number of approved guest rooms: **90**

Parking facilities (number of spaces, description): **90**

Other amenities, services and facilities:

PART 111:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
             COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

31



**RAMADA**

RAMADA LIMITED • INN • PLAZA HOTELS

*FRANCHISOR: RAMADA FRANCHISE SYSTEMS, INC.*
*"EXHIBIT B"*
*PUNCHLIST FOR CONVERSION*
*JANUARY 21, 2002*
*(Revised April 16, 2002)*

| | | |
|---|---|---|
| **FACILITY** | **TIER** | **GUEST ROOMS** |
| Comfort Inn | Limited | 90 |
| 825 West Dixie Drive | | |
| Asheboro, NC 27204 | | |

| | |
|---|---|
| **OWNER/APPLICANT** | **SALESPERSON** |
| Richard Millard | Scott Zanato |
| (305) 577-8484 | (813) 930-0379 |

**O.A. REPRESENTATIVE**
Phil Osborne

## PROPERTY CONDITION SUMMARY

This is a 12 year old, 2-story, interior corridor property that consists of 2 buildings. The first building contains the lobby/front desk, exercise room and 38 guestrooms. The second building contains 52 rooms. Both buildings are connected by a covered outdoor walkway. Construction is concrete block with single-color brick and aggregate stone finishes. Renovations to the public areas and guestrooms have recently been completed. Some upgrading of the exterior areas, public space and guestrooms is required. Landscaping is acceptable.

The property is located at the intersection of US 220 and US 64 and is a stopping point for travelers to Myrtle Beach. Clientele includes 50% corporate/commercial and 50% transient business. Some business is also derived from Corporate Lodging accounts and the NC Department of Corrections. Area attractions include the North Carolina Zoo in Asheboro and Seagrove, NC a popular town known for it's handcrafted pottery. Industrial facilities in Asheboro include Klaussner Furniture, Energizer Batteries and Sara Lee.

| | **EXISTING** | **STANDARD** |
|---|---|---|
| Lobby Dimensions: | 1008 SF | 800 SF |
| Guest Room Dimensions: | 288 SF (83) | 288 SF |
| | 336 SF (4) | |
| | 624 SF (2) | |
| | 576 SF (1) | |

## COMPLETION TIME
**All items listed in this punchlist must be completed before opening as a Ramada unless otherwise noted.**

2

Comfort Inn
Asheboro, NC



**PROPERTY SIGNAGE**

1. Provide Ramada Limited exterior signage per Company specifications. Signage must be purchased from a vendor approved in advance by the Franchisor, and may not be installed without prior written approval from the Property Openings Department. **Your License Agreement controls your use of signage and timing of installation.** All existing signage (building, high-rise, channel letters, billboards, etc.) must be removed. Modification of the existing signage or face replacement is prohibited.

2. Integrate RAMADA LIMITED signature "Monument" into property layout.

**PROPERTY EXTERIOR**

1. Upgrade building exteriors to include the following:
   a. Replace any guestroom windows with broken seals or fogged appearance as in room #119. **To be completed no later than December 1, 2002.**
   b. Pressure wash/chemically clean walkways to eliminate stains.

2. Hotpatch, reseal and stripe parking lot. Resurface badly cracked and damaged areas.

3. The swimming pool was closed at time of inspection. At time of season opening, pool area and furniture package must meet Company specifications. Safety and security package (i.e. shepherd's crook, life preserver, etc.) are required to be displayed year round. Prior to season opening or by May 1, 2002, upgrade swimming pool to include the following:
   a. Install "FT" markings on the vertical coping tile.
   b. Replace furniture package. A minimum of 4 tables with umbrellas, 16 chairs, and 10 chaise lounge chairs is required.
   c. Pressure wash/chemically clean deck to eliminate stains.
   d. The existing pool fence is acceptable until condition grades below a "B" on any future Quality Assurance inspection. At that time the fence must be replaced. Pool fence must be a minimum height of 4' – 6'. Gates are to be self-closing and latching. The installation of chain link, wood or vinyl fencing is prohibited.

3

Comfort Inn
Asheboro, NC

1. The property currently has a phone system that offers a voice mail system, computer data ports and automated wake-up calls with a greeting message.

2. The owner is responsible to provide facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.

3. Provide a meeting room/board room facility for a minimum of 16 people. Meeting room must provide a comfortable and pleasing yet business-like atmosphere. Furnishings and fixtures must be color coordinated and in accordance with Company specifications.

4. Upgrade public restrooms and stairwells to include the following:
   a. Replace wallcovering in the men's public restroom. Company requires minimum 22-ounce vinyl wallcovering.
   b. Refinish/replace stall partitions in the men's restroom. Recommend a light, neutral laminate or similar upgraded material.
   c. Paint/refinish stairwell walls.
   d. Replace VCT flooring in stairwell landings. Recommend a minimum of 6" – 8" single-color ceramic tiles or carpet. Company requires minimum 32-ounce cut pile carpet with padding. Carpet must be designed for commercial traffic.

5. Ramada Limited's Hospitality Room:
   a. A Hospitality Room with a leisure section and breakfast section is required for all Ramada Limiteds.
   b. The leisure section is to have a comfortable sitting area, a selection of magazines, newspapers and large screen TV (27" minimum).
   c. The Breakfast section is to have seating at 2 and 4 top tables, a permanent built-in counter serving area, TV viewing and attractive décor.
   d. The Executive Continental Breakfast is a primary signature item of Ramada Limited and must be in full operation at time of entry inspection.
   e. Contact the Property Openings Department at (800) 343-7639 for additional information.

4

Comfort Inn
Asheboro, NC

## PROPERTY MANAGEMENT SYSTEM REQUIREMENTS

1. A Company approved Property Management System (PMS) is required.
   Requirements are below, or as specified in your License Agreement.
   a. Dot matrix printers will require a paper hole for the bottom feed of forms.
   b. A space for the file server must be made in the front desk area or in an area which is accessible 24-hours a day including the ability for the night auditor to utilize it.
   c. Space must be located near the file server for any interface equipment that will be needed, i.e.: call accounting and Point of Sale (POS) terminals. When considering the placement of this equipment remember that it will need electrical outlets and that the interface vendor will need to run cable from the interface equipment to the Property Management System (PMS).

2. Hardware power requirements are as follows:
   a. Proper electrical connections must be in place or the Property Management System will not be installed. Refer to the Installation Guide for specifications.
   b. One Uninterrupted Power Supply (UPS) unit will be supplied with the package. The UPS must be placed at least three feet from the file server.
   c. The file server and its monitor will plug into the UPS using 2 of its power outlets.
   d. Each workstation will require 2 power outlets.
   e. Each printer and modem will require 1 power outlet each.
   f. The UPS will require 1 dedicated power outlet on its own dedicated circuit breaker.

3. Telephone line requirements are as follows:
   a. Two dedicated telephone lines with their own phone numbers are required. Three are recommended. No other modems, fax machines, etc are to be connected to these phone lines. For the third phone line, used for Internet access, we will allow a line to run through your phone switch.
   b. Two modems will be supplied with the package.

4. Interface vendors must be contacted in advance to insure that they will meet the requirements. The franchisee is responsible for arranging any required interface upgrades that may be necessary and for the testing of these upgrades.

5. All cable must be from a Company approved vendor. Refer to the Installation Guide for specifications.

5

Comfort Inn
Asheboro, NC

**GUESTROOMS/BATH** (Rooms Inspected): 129, 137, 146, 246, 244, 235, 233, 237, 106, 108, 110, 116, 333, 228, 215, 210, 205, 202.

1.  Electronic key cards must include the Ramada logo with the 800 number to central reservations and WWW.Ramada.com.

2.  Renovate guestrooms to include the following:
    a.  All furniture, finishes and fixtures must coordinate with other room furnishings.
    b.  Reapply/refinish wallcovering where damaged or scuffed as in rooms #116, #146, #212 and #244. Company requires either vinyl wallcovering (minimum of 14 ounce) or an approved textured finish.
    c.  Replace/refinish furniture package where scuffed, worn or damaged as in rooms #137, #205, #233 and #235. Provide activity tables or desks where missing as in room #129. Casegoods must be new upon installation. A minimum of one credenza/armoire, a framed wall mirror, one headboard per bed, and one freestanding nightstand for a two-bedded room, two for a single bedded room is required. A writing surface is required to consist of either a desk or an activity table.
    d.  Replace scuffed, stained and worn occasional chairs, leisure chairs and ottomans. Provide chairs where missing as in room #129 and #233. Two armed chairs per room are required in addition to existing desk chairs. Chairs must be fabric covered. Armless chairs as in room #137 are not acceptable.
    e.  Provide credenza light sources where missing as in room #129. Provide 2 lamps per headboard wall, a credenza lamp and a floor lamp at leisure area. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable. Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not acceptable.
    f.  Night-lights are required in all guestrooms. Suggested placement for these night-lights include bathroom, vanity or entrance door area.
    g.  One full-length mirror in each guestroom is required, 14" x 54" minimum size.
    h.  Provide UL approved fire resistant wastebaskets.
    i.  **Upon replacement, and no later than April 1, 2006, minimum 27" remote control televisions are required.**
    j.  Replace/modify existing closet rack with a new design that will allow removable wooden hook style hangers.

3.  Renovate bath area to include the following:
    a.  Replace/refinish vanities and sinks where burned, scuffed, chipped or stained as in rooms #137, #146, #205, #235 and #220. Corian, cultured marble or a light, neutral laminate are acceptable options. Ensure vanities have adequate skirting and a concealed support system.
    b.  Replace vanity mirrors where desilvered as in rooms #233 and #246. Mirrors should extend the length of the vanity.

6

Comfort Inn
Asheboro, NC



4.     Company requires that all properties maintain housekeeping at the highest levels. We strongly recommend that the property implement housekeeping training programs to ensure customer satisfaction.

5.     Logo supplies must be available at the entry inspection but may not be placed in the guestrooms until official opening.

6.     All new Ramada Owners and General Managers are required to complete orientation. It is strongly recommended that this take place prior to opening as a Ramada, but in no event may it be postponed any longer than 90 days after the opening date

7

Comfort Inn
Asheboro, NC

---

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

---

This Punchlist identifies items that require action due to meet the Franchisor's standards. The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations. You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified. The owner is responsible for meeting all Franchisor Standards. All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist. Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor. Also, this Punchlist may become null and void if the property does
not enter the System within 180 days after the punchlist date or as otherwise specified by the
license (franchise) agreement.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

NOTE: Any item on this Punchlist that is not required to be completed prior to opening as a
Ramada will continue to be evaluated for appearance and condition during all Quality Assurance
inspections conducted before the date when completion is required.

**This punchlist was revised on April 16, 2002. All previous copies are invalid.**

1.  revised 4/9/02 by: ams       2.  revised 0n 4/16/02

Signed: _X/William Hull_                    Date: _4/29/02_

Print Name: _H William Hull Jr_

NC ASHEBORO COMFORT INN CV RL
Nb/ah

**RAMADA FRANCHISE SYSTEMS, INC.**
**SCHEDULE C**
**November 2001**

The RINA Services Assessment Fee is equal to 4.5% of Gross Room Revenues.

Other Fees. The GDS Fee described in Section 7 is $4.00 per gross reservation communicated through the Global Distribution Systems. Internet-originated reservations carry fees of either (i) $2.50 per gross reservation booked through the Chain's web site or other Internet sources, or (ii) $7.00 per gross reservation booked over the TravelWeb.com Internet booking web site. Internet reservations may also carry travel agent commissions if the originator qualifies. If a reservation booked on the GDS, Chain web site or other Internet source, or TravelWeb.com, is canceled by the guest using the same source or web site as was used to make the reservation, you may not be charged the applicable fee. The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by a travel agent plus our service charge of $0.35 per commissionable reservation. The general sales agent commission (also known as international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in a place outside the United States in which the Chain is represented by a general sales agent/international sales office and includes the travel agent commission. We charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations, participating in our Member Benefits sales program, a portion of which we or an affiliate retains as a service fee.

If the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, you will be charged a "First Assessment" of $10.00 for each additional complaint received during that year. You will be contacted when the complaint is received and you will be responsible to resolve the complaint to the satisfaction of the guest. If you do not respond to any complaint for which you have received a First Assessment within seven business days after referral to you and the guest contacts us again to seek a response, you will be charged a "Second Assessment" of $25.00, plus the costs we incur to settle the matter with the guest. If you respond in a timely manner but the guest remains unsatisfied, you will be charged the costs we incur to settle the matter with the guest. You will be informed of your Annual Facility Allotment when it is established. The amounts of the First and Second Assessments may be changed on a Chain-wide basis at any time upon 60 days advance notice, with the approval of the RINA Executive Committee.

The RINA Services Assessment Fee is subject to change for all Chain facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

32

**EXHIBIT B**

ADDENDUM TO THE LICENSE AGREEMENT
FOR SATELLITE CONNECTIVITY SERVICES

This Addendum to the License Agreement for Satellite Connectivity Services (the "Addendum") by and between **Ramada Franchise Systems, Inc.** ("we," "our," "us") and **Asheboro Tectel II, LLC** ("you") is dated _____, 2002 (the "Addendum Effective Date").

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. Services. Our affiliate has entered into an agreement with Hughes Network Systems, Inc. ("HNS") under which we are authorized to provide our licensees with satellite-based Internet connectivity services. The specific satellite communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We will sell to you the Services and Equipment (collectively, the "VSAT System") for the Facility. Once installed, you will access the Central Reservation System, the Central Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the VSAT System, except in emergencies, while this Addendum remains in effect.

2. Site Inspection. You will complete the questionnaire we will furnish you. After you return the questionnaire to us, HNS will inspect the Facility to determine how the Equipment will be installed at the Facility. We or HNS will, in our sole discretion, determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services. The Equipment will not be installed until you have returned the questionnaire to us and the Facility has been inspected. You will be in default under this Addendum if you do not return the completed questionnaire to us within twenty (20) days after you sign this Addendum. You must cure this default within ten (10) days after you receive written notice of the default from us.

3. Installation. HNS will install the Equipment at the Facility during regular business hours, when possible. HNS may install, at its sole discretion, anti-icing equipment to protect the Equipment at the Facility at no additional cost to you. If anti-icing equipment is installed, you must provide, at your expense and prior to the installation date, a source of 110V GFCI 20-amp non-dedicated circuit AC power that is readily available at the antenna site. If your installation involves more than two access devices, or additional Equipment, cabling or costs beyond the standard installation package, we may charge you for the charges we incur with HNS to complete installation of the VSAT System, plus an administrative charge of nor more than $50.00. You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain

Equipment on the roof or attached to the exterior walls of the Facility. You will furnish installation personnel, free of charge, with adequate electrical power, local telephone service, water and other utilities necessary to perform the installation. If (a) you postpone a scheduled installation with less than seven (7) days prior written notice to us, or (b) an installation is delayed or aborted because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you. If a second Cancellation occurs, you will be in default under this Addendum. You must then cure this default within thirty (30) days after you receive written notice from us. Toll-free access to the Central Reservation System will be unavailable to you while you are in default under this Addendum. We will provide and will reprogram your property management system or property terminal unit to dial a working telephone number for Central Reservation System access, which may cause you to incur toll charges.

    4.   <u>Operations; Authorizations</u>. (a) Once installed, you will not move the Equipment without our prior written consent. You will maintain the Equipment according to the environmental conditions we specify. Upon reasonable prior notice, you will give us or HNS reasonable access to inspect the Equipment.

    **(b) You will maintain, at your expense, any necessary permits and licenses required for your use of the VSAT System.**

    (c) After the Start Date, we will provide through HNS the Services during the Term so long as you are not in default under this Addendum or the Agreement.

    5.   <u>Support and Maintenance</u>. After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting VSAT System problems. You will contact the number promptly when and if you experience any problems with the VSAT System, or if any casualty affects the VSAT System. We or HNS will work with you to determine if the problem requires support or maintenance services. The support and maintenance services we or HNS will provide you are listed in Schedule 2 to this Addendum. You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these services.

    6. <u>Monthly Charges</u>. You will pay to us for the VSAT System a Monthly Service Charge in arrears of $84.00 for the period (the "Install Period") beginning on the "Start Date" and ending at the end of 24 full months after the "Term Start Date", and $150.00 after the Install Period, or such lesser amount as we determine to charge all similarly situated licensees in our sole discretion for any subsequent period of time and so notify you in writing. Charges will begin to accrue on the date we notify you that the Equipment has been installed at the Facility and the VSAT System begins operating (the "Start Date"). We will invoice you for the Monthly Service Charge in advance each month. We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month. You will pay the invoice amount to us upon receipt. You will also pay any

excise, sales, use or other taxes assessed in connection with the VSAT System. We may apply any amounts received to any outstanding invoices in any order.

7. Term. This Addendum will be effective from the date of execution by you and us and shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the sixtieth (60th) month, starting on the first day of the month following the Start Date (the Term Start Date"), unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. Software. (a) We assign to you HNS' non-exclusive licenses to use the operating systems in connection with the VSAT System (the "Software"), subject to the conditions and limitations in this Addendum. The Software licenses are found on the packaging of the Equipment. The Software may be used only in conjunction with the VSAT System at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

(b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. Title to Equipment; Risk of Loss; Insurance. HNS or its designee retains title to the Equipment. You have no right, title, or interest in the Equipment other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or HNS may, at our option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any cause whatsoever, unless we or HNS directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood, fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Cendant Corporation, Cendant Finance Holding Corporation, their successors and assigns as additional insureds. The coverage may not have a per-occurrence deductible amount greater than Five Hundred Dollars ($500.00). You will furnish us, prior to installation of the VSAT System, with a certificate of insurance showing the insurance coverage is in

effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10.   Force Majeure. If performance by you, HNS or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

11.   No Warranties; Security; Indemnity. (a)   WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE VSAT SYSTEM, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

(b)   We do not warrant any connection to or transmission over the VSAT System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services. We do not warrant that the VSAT System will be operate uninterrupted or error-free.

(c)   You may not use the VSAT System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services. You are responsible for all content transmitted from the VSAT System using the Services.

(d)   You are responsible for user access security for the VSAT System, and any unauthorized use of the VSAT System. You must authorize and supervise the users of the VSAT System. We may not provide user access security. However, we and HNS will use reasonable efforts to assist you with detecting and identifying a possible security breach.

(e)   We or HNS may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information. These controls include (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons

you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and (v) preventing the loss of data processed or transferred.

(f) You acknowledge that the VSAT System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. We or HNS may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

(g) You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of employees, agents, guests, and all other persons and entities, arising out of your operation, use or non-use of the VSAT System, including any content disseminated from the VSAT System at the Facility. We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and Equipment.

12. <u>Temporary Internet Service</u>. If installation of the VSAT System at the Facility is delayed when your Facility opens as a Chain Facility, you must subscribe, on a temporary basis, to the Internet access service we designate if it offers a local point of presence where the Facility is located. The cost of the monthly access fee will not exceed $39.95. However, in certain locations you may be obligated to pay additional Internet access charges if your usage exceeds certain specified limits. If our designated supplier does not offer service in your area, you must subscribe to another Internet service provider, at your cost, until local Internet access service is available from our designated supplier so you can access our information sources available to licensees over the Internet. You will be responsible for all charges for local access and long distance telecommunications, except the direct charges of any toll-free service we offer.

13. <u>Default; Termination; Attorney's Fees</u>. (a) If you are in default under Section 11.1 of the Agreement, or any one of the events described in Section 11.2 of the Agreement that gives us the right to terminate occurs, or you violate Section 11(c) of this Addendum, or you violate Section 8 of the Addendum, or you are in default under either Sections 2 or 3 of the Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured. Additionally, if you default under this Addendum and do not cure the default within the time permitted, we may, at our option, terminate only this Addendum and not the Agreement, upon written notice to you.

(b) Upon the termination of this Addendum for any reason, you will permit us or HNS reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US, HNS OUR OR THEIR

AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c) If we terminate this Addendum under Section 13(a), you will pay us "Addendum Liquidated Damages" of One Thousand Dollars ($1,000.00) within 10 days following the date of termination. Addendum Liquidated Damages are paid in place of our claims for lost future Monthly Service Charges under this Addendum and the costs to de-install the Equipment. You and we acknowledge that actual damages are difficult or impossible to ascertain on the Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected.

(d) The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**RAMADA FRANCHISE SYSTEMS, INC.**

By:_____
                (Vice) President


**YOU,** as licensee:
**ASHEBORO TECTEL II, LLC**

By:_____
Title:**Manager**

## SCHEDULE 1
## SERVICES AND EQUIPMENT

The Services are full duplex point-to-multipoint satellite communications between an HNS shared hub (the "Hub") and the Facility. The Services include the following:

1) Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2) Built-in redundancy to ensure a higher level of Service availability in the event of HNS equipment failure.

3) Installation of the Equipment at the Facility.

4) Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

5) Equipment maintenance services specified in Schedule 3 of this Addendum.

The Equipment consists of :

1) DW2000 outdoor satellite antenna, indoor equipment with two Ethernet ports, two serial (RS-232) ports, and integrated 40 gigabyte hard drive and caching software license.

2) Ethernet Hub (8 port), including up to 25' of Ethernet cabling and connections per device for up to 2 separate devices

3) Anti-icing equipment, where required.

## SCHEDULE 2
## SUPPORT AND MAINTENANCE

You will receive the following maintenance and support services:

1) Telephone Support. You may contact HNS' satellite control center 24 hours per day, 365 days per year by calling a toll free telephone access to receive Service support.

2) Corrective Maintenance. If HNS determines that the Equipment is not operating properly, HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

a) Diagnostic testing to determine the existence and cause of the malfunction;

b) Removal and replacement of any malfunctioning field replaceable Equipment ;

c) Reorientation (repointing) of the antenna subsystem;

d) Repair or replacement of Equipment interconnecting cables;

e) Reloading initializing instructions and recommissioning;

f) Verification of proper operation and completion of service report; and

g) Notification to the you, us and the control center that the Equipment has been restored to operational status.

3) Limitations. Maintenance services do not include any of the following services:

a) Maintenance, repair, or replacement of parts damaged or lost through catastrophe, accident, lightning, theft, misuse, fault, or negligence of the you or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use.

b) Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS-approved upgrades and configuration changes

c) Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices

4) Software Maintenance. HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications as promptly as commercially reasonable at no cost to Customer.

5)   <u>Software Maintenance Service Limitations</u>.   We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

# EXHIBIT C



| **RAMADA®** | RAMADA FRANCHISE SYSTEMS, INC. |
|---|---|
| | 1 SYLVAN WAY, PARSIPPANY, NJ 07054-0278 |
| | PHONE (973) 428-9700 • FAX (973) 496-5345 |

FRANCHISE ADMINISTRATION
HOTEL DIVISION

February 26, 2004

<u>**VIA AIRBORNE EXPRESS**</u>

Mr. Bill Hall
Asheboro Tectel II LLC
Tiffany Office Plaza
800 Tiffany Blvd.
Suite 301
Rocky Mount, NC 27804

**Re:    NOTICE OF MONETARY DEFAULT relating to Ramada® Unit #14440-97446-1
located in Asheboro, North Carolina (the "Facility")**

Dear Mr. Hall:

I write on behalf of Ramada Franchise Systems, Inc. ("we," "our," or "us") regarding the License Agreement dated May 23, 2002 between Asheboro Tectel II LLC ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to timely pay us the Recurring Fees and other charges relating to your operation of the Facility under the System. Our Financial Services Department advises us that as of February 24, 2004 your account is past due in the amount of $34,508.65. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have 30 days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, the Agreement may be subject to termination.

As you no doubt recall, the Agreement provides you with certain rights and benefits that in return, require you to cure any defaults under the Agreement within the time permitted. We remind you that if you fail to cure your default timely, your Additional Termination Right and Special Royalty will expire automatically at the end of the cure period. You will then be obligated to perform your responsibilities under the Agreement for the remainder of the term.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default.

RAMADA® LIMITEDS • RAMADA® INNS • RAMADA® PLAZA HOTELS

Mr. Bill Hall
February 26, 2004
Page 2

Also enclosed is a Site Contact form. The Site Contact form is used to update the Site Contacts for the Facility and ensures that the contacts are current. Please complete the form and return to our attention by March 11, 2004 via regular mail or facsimile to (973) 496-7570.

We hope you will take this opportunity to restore your good standing under the Agreement. If you have any questions regarding your default or how it can be timely cured, please call Robert Kolatac, Financial Services Manager, at (973) 496-5457.

Sincerely yours,

Colleen Fitzpatrick
Senior Director
Compliance, Settlements & Reinstatements
Franchise Administration

Enclosure

cc:    Melissa Thompson (Site Principal)
       Paul Hanley
       Robert Kolatac

 **RAMADA**

RAMADA FRANCHISE SYSTEMS, INC.
1 SYLVAN WAY, PARSIPPANY, NJ 07054-0278
PHONE (973) 428-9700 • FAX (973) 496-5345

FRANCHISE ADMINISTRATION
HOTEL DIVISION

## RAMADA FRANCHISE SYSTEMS, INC.
### CONTACTS FOR SITE #14440-97446-1 LOCATED IN ASHEBORO, NORTH CAROLINA
### AS OF _____

Please enter the names and addresses of all persons in your organization whom you designate for each category specified below and return this form by facsimile to (973) 496-7570 or mail to: Ramada Franchise Systems, Inc., 1 Sylvan Way, Parsippany, NJ 07054, Attn: Wendy Emmons, Franchise Administration Department. If you have any questions regarding this form, please contact your Franchise Services Manager at (800) 888-INFO (4636).

**Principal Mailing Contact For Legal Notices**

| |
|---|
| Name: |
| Title: |
| Company: |
| Address: |
| |
| Phone: |
| Fax: |
| Email: |

**General Manager**

| |
|---|
| Name: |
| Title: |
| Company: |
| Address: |
| |
| Phone: |
| Fax: |
| Email: |

**Accounting/Invoice Contact**

| |
|---|
| Name: |
| Title: |
| Company: |
| Address: |
| |
| Phone: |
| Fax: |
| Email: |

**Guest Services Contact**

| |
|---|
| Name: |
| Title: |
| Company: |
| Address: |
| |
| Phone: |
| Fax: |
| Email: |

Authorized by: _____
                            (Franchisee)

        By: _____
                        (Signature)

    Name: _____
                        (Print)

    Date: _____

(Must be signed and dated by a Principal of Franchisee in order to be valid)

Revised: 2/28/03

**RAMADA® LIMITEDS • RAMADA® INNS • RAMADA® PLAZA HOTELS**

# EXHIBIT D



**RAMADA** RAMADA FRANCHISE SYSTEMS, INC.
1 SYLVAN WAY, PARSIPPANY, NJ 07054-0278
PHONE (973) 428-9700 • FAX (973) 496-5845

FRANCHISE ADMINISTRATION
HOTEL DIVISION

May 25, 2004                                                    <u>Via Airborne Express</u>

Ms. Melissa Thompson
Asheboro Tectel II LLC
c/o Ramada Limited
825 West Dixie Drive
Asheboro, NC 27205

**RE:**   License Agreement, dated May 23, 2002, (the "Agreement") between Asheboro Tectel II LLC ("you" or "your") and Ramada Franchise Systems, Inc. ("we," "our" or "us") for the Ramada® lodging facility located at Asheboro, NC/#14440-97446-1 (the "Facility")

Dear Ms. Thompson:

We write to give you formal notice of your default and termination (the "Notice") under the Agreement for the Facility. Termination of the License granted under the Agreement to operate the Facility as part of the Ramada System will be effective on September 9, 2004 (the "Termination Date"). You are in default under the Agreement for both your failure to meet your financial obligations and your failure to satisfy the required Quality Standards. We will address each default in turn.

<u>The Financial Default</u>

The default arises from your failure to meet your financial obligations under the Agreement. The amount (the "Trial Balance") we believe is outstanding as of May 25, 2004 is $49,705.00. The Trial Balance is described in more detail on Exhibit A to this Notice. The Trial Balance includes the following: (i) actual unpaid Recurring Fees calculated according to the Agreement based on your filed monthly revenue reports; (ii) estimated unpaid Recurring Fees calculated according to the Agreement for all months in which you did not submit to us a monthly revenue report (this amount is subject to change when you submit such reports); (iii) other unpaid fees and charges calculated according to the Agreement for travel agent commissions, Internet fees, Initial Fees, Note principal and interest, and the like, all as accrued through the date of this Notice; and (iv) interest on the unpaid balances calculated according to the Agreement. We will revise the Trial Balance accordingly when you submit to us all information we need to compute, reverse or verify your Recurring Fees and other charges, and we apply any payments that have been sent to us in good

RAMADA® LIMITEDS • RAMADA® INNS • RAMADA® PLAZA HOTELS

Ms. Melissa Thompson
May 25, 2004
Page 2

funds but not applied to the account of the Facility. When corrected, the Trial Balance shall be the "Current Balance."

By August 23, 2004, you must pay us the Current Balance and submit to us all additional information, such as monthly revenue reports and cancellation/reconciliation forms for travel agent and other commissions, in addition to all other fees or payments that subsequently accrue and come due under the Agreement from the date of this Notice until August 23, 2004, such as Recurring Fees, additional interest and other amounts. We refer to such additional amounts and the Current Balance collectively as the "Account Balance."

If you pay the Account Balance to us by check, the payment date will not be the date we receive the check but the date on your bank confirms to us that funds are immediately available in the amount of the check. Consequently, we recommend that you submit payment to us by bank, cashier's or certified check, or by wire transfer (instructions enclosed), or you allow at least five business days before August 23, 2004 for your check to clear.

Please know that your partial payment of the Account Balance, even we accept this payment, does not cure your default under the Agreement. Unless full payment is made by August 23, 2004 or the Franchise Compliance Committee extends the Termination Date, your License will be terminated on September 9, 2004.

## The Quality Assurance Default

The Agreement obligates you to comply with our Quality Standards throughout the term of your License. The Facility has failed to achieve and maintain the required Quality Assurance ("QA") inspection score under the Agreement. The QA inspection history of the Facility demonstrates your failure to meet our Quality Standards, despite our repeated requests and demands for you to do so.

The events leading up to this Notice of Default and Termination are summarized below:

| Date | Score |
|------|-------|
| March 30, 2004 | Quality Assurance Failure<br>QA Score = 374-F |

The Facility must receive a QA score of at least 435 and pass the Housekeeping and Food & Beverage segments by August 23, 2004. Unless we extend the Termination Date, the Agreement will be terminated on the Termination Date. For your convenience, a Quality Assurance inspection will be conducted at the Facility on or about August 23, 2004.

Please know that you must cure both defaults under the Agreement by the Termination Date to avoid a termination of your License. If your License terminates, you will also lose your right to

Ms. Melissa Thompson
May 25, 2004
Page 3

continue to use the seamless interface version of the Project Power Up property management system. You must then make your own arrangements with the software vendor for a new license, as stated in your Software & Services Agreement.

Additionally, if your License is terminated, you will be obligated to pay us Liquidated Damages and perform your post-termination obligations such as removal of all Ramada identification ("de-identification") at the Facility. This de-identification process must commence immediately upon termination of the License.

The Agreement provided you with certain rights and benefits that in return, require you to cure any defaults under the Agreement within the time permitted. Because you failed to do so, your Additional Termination Right has expired. You must now perform your obligations under the Agreement for the remainder of the term.

This Notice does not modify, replace or affect any current or future default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions in regard to the quality assurance aspect of this Notice, please contact Stratton Michals, Director of Quality Assurance, at 973-496-8509. If you dispute this debt, please call Robert Kolatac, Financial Services Manager, at 973-496-5457.

Sincerely,

James D. Darby
Vice President
Compliance
Franchise Administration

Enclosure

cc:     Paul Hanley
        Stratton Michals
        Robert Kolatac

# EXHIBIT E



**RAMADA FRANCHISE SYSTEMS, INC.**
1 SYLVAN WAY, PARSIPPANY, NJ 07054-0278
PHONE 1-866-582-9104 • FAX (973) 496-5345

FRANCHISE ADMINISTRATION

December 7, 2004

**Via Airborne Express**

Ms. Melissa Thompson
Asheboro Tectel II LLC
825 W. Dixie Drive
Asheboro, NC 27205

8602 9422 673

RE:   **License Agreement, dated May 23, 2002, (the "Agreement") between Asheboro Tectel II LLC ("you" or "your") and Ramada Franchise Systems, Inc. ("we," "our" or "us") for the Ramada® lodging facility located at Asheboro, North Carolina/#14440-97446-1 (the "Facility")**

Dear Ms. Thompson:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Ramada System (the "Notice"). This termination is as a result of your failure to cure your default under the Agreement, due to your failure to satisfy the required Quality Standards and your failure to meet your financial obligations. The termination of your Agreement is effective as of December 7, 2004 (the "Termination Date").

Because your License is terminated, you must now perform your post-termination obligations such as removal of all items that display or refer to the Ramada brand at the Facility. The de-identification procedures are specified in the attachment to this letter. These de-identification procedures must be completed within 14 days after the date of this Notice.

You must also immediately pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of December 3, 2004, you owe us $98,602.20 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $100,000.00 as specified in the Agreement. You must also pay us Liquidated Damages of $1,000.00 for early termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"). The Addendum will also terminate on the Termination Date.

**RAMADA® LIMITEDS • RAMADA® INNS • RAMADA® PLAZA HOTELS**

Ms. Melissa Thompson
December 7, 2004
Page Two

Please know that, because your License has terminated, you also have lost your right to continue to use the seamless interface version of the Project Power Up property management system. You must now make your own arrangements with the software vendor for a new license, as stated in your Software & Services Agreement.

If within the 14 day period described above, you do not timely remove the exterior signage which bears the Ramada name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within 14 days of the date of this letter.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions regarding your obligations under this letter, please contact Randi Siouffi, Manager of Settlements, at (866) 582-9104, option 6.

Sincerely,

Kathy Cox
Senior Director
Franchise Administration

Enclosures

cc:    Keith Pierce
       Randi Siouffi



**RAMADA** RAMADA FRANCHISE SYSTEMS, INC.
1 SYLVAN WAY, PARSIPPANY, NJ 07054-0278
PHONE 1-866-582-9104 • FAX (973) 496-5345

# DE-IDENTIFICATION PROCEDURES

FRANCHISE ADMINISTRATION

You must complete each of the following within 14 days after the Termination Date:

1.    Remove, replace or cover with an opaque cover the primary Facility signage.

2.    Remove all interior signage that contains Ramada Marks.

3.    Change advertising billboards to remove Ramada Marks.

4.    Stop answering Facility telephone as Ramada guest lodging facility.

5.    Remove Ramada name and Marks from any domain name, advertising and brochures.

6.    Return to us all confidential operations and training manuals.

7.    Remove the Ramada name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8.    Paint over or remove any distinctive Ramada trade dress, paint schemes or architectural features.

9.    It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Ramada facility.

10.    Our quality assurance inspectors will visit the Facility at any time after 14 days after the Termination Date to verify that you have performed these de-identification obligations.